FIRST AMERICAN TITLE INSURANCE
CO. OF TEXAS & Henderson Savings
& Loan Association, Appellants,

v.

Kenny WILLARD, Jimmie Katherine
Colley Willard, & Lone Star Gas
Company, Appellees.

No. 12–93–00290–CV.

Court of Appeals of Texas,
Tyler.

March 24, 1997.

Rehearings Overruled May 12 and 19, 1997.

Abney D. Bassell, Walter S. Fortney, III, Jim Cheatham, Fort Worth, for appellants.

Ken Good, Dan C. Kelley, Tyler, David B. Griffith, Gilmer, Joe E. Shumate, Henderson, for appellees.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

## OPINION AFTER MOTIONS FOR REHEARING

RAMEY, Chief Justice.

On August 26, 1996, this Court issued its original opinion in this cause. Thereafter, Appellees, Lone Star Gas Company and Kenny Willard, and Appellants, First American Insurance Company of Texas and Henderson Savings & Loan Association, filed motions for rehearing. We grant First American's motion for rehearing as to Willard's attorney's fees and prejudgment interest and as to the use of the word "remand" regarding Lone Star's judgment against First American. The other motions for rehearing are overruled as well as First American's point of error as to Lone Star's attorneys' fees. Our original opinion is withdrawn and the following opinion substituted:

This is a pipeline easement encroachment case. After a jury trial, First American Title Insurance Company of Texas ("First American"), a title insurance underwriter, and Henderson Savings & Loan Association ("Henderson"), a lender, appeal from a money judgment in favor of Lone Star Gas Company, a Division of Enserch Corp. ("Lone Star"), the pipeline owner, and Kenny Willard ("Willard"), a home builder/borrower.[1] First American assigns 27 points of error and Henderson assigns two additional points; Lone Star urges two cross-points of error. We will affirm in part and reverse and render in part.

In October 1987, a house was being built for Willard when it was discovered that the structure was located above Lone Star's gas pipeline. The transaction had arisen when Willard sought interim and permanent financing from Henderson to build a house on a 2.59 acre tract conveyed to him by his parents.

A Builders and Mechanics Lien contract was executed by Willard and his wife to the construction contractor, South Place Building Contractors, Inc. ("South Place"), in the principal amount of $43,900, which was assigned to Henderson. The lender, Henderson, required a mortgagee title insurance policy to protect its loan collateral in the event a title defect reduced the property's value. Henderson secured a title insurance binder effective during house construction and a commitment to issue the mortgagee's title policy from Pearson Abstract & Title Company ("Pearson"), First American's agent.

Willard testified that he selected the location for the house. One of the factors considered was an unrelated but visibly marked Texas Utilities' pipeline right-of-way across another part of Willard's tract. As to the Lone Star pipeline, the company had obtained a blanket easement[2] across Willard's

---

1. Jimmie Katherine Colley Willard had joined her husband as a cross-plaintiff; she, however, made no recovery and is not a party to this appeal.

2. An easement without a metes and bounds de-

land from Willard's grandparents in 1963, which easement was recorded. Neither Willard nor the construction contractor, Jim Peterson ("Peterson"), of South Place, nor any of the people involved in the subject house construction were aware of the blanket easement or the pipeline.

Earl Young, Pearson's owner, who was deceased at the time of trial and whose testimony had not been preserved, prepared the mortgagee title insurance binder and title policy commitment. The binder certified that the Willards had "a good and indefeasible title to the land ..." upon which the house was being constructed, the exceptions being Henderson's lien and "[a]ny easement and/or right-of-way which is visible and apparent from an examination of the premises." From the circumstances, it was the view of the testifying expert witnesses that the failure to except the Lone Star easement from title policy coverage was a "search error" by Young.

At some disputed point in the course of the construction project, after the Willard house was more than 50% completed, a Lone Star pipeline employee observed that the house was situated over the company's pipeline. Upon being informed of the existence of the pipeline under the house, Henderson stopped financing the project. The parties agreed that the house construction was then too advanced to relocate the house; they, however, did favor moving the pipeline from beneath the house. First American thereupon acknowledged its prior commitment to write the title insurance, which included coverage for Lone Star's easement. Henderson resumed its financing commitment to Willard after Willard executed a hold harmless agreement to Henderson indemnifying Henderson (and the contractor) from any claims resulting from the location of the house above the pipeline. Thereafter, the house was completed and the interim financing was closed into permanent financing;

First American's title policy was issued without an exception to its coverage of Lone Star's easement. The premium for the mortgagee title insurance policy was charged to Willard as a part of the loan settlement expense and paid from the proceeds of Willard's loan.[3]

Since the closing, Willard has regularly made his house loan payments to Henderson; the pipeline has not been moved from beneath Willard's house. Lone Star determined that the cost of such a move would be $16,000.[4] When the case was tried in April 1993, First American conceded that under its title policy with Henderson it was responsible for the cost of removing the pipeline. First American had offered $18,000 to pay for the relocation of the pipeline; the offer was refused by Lone Star because of some additional expenses it had incurred due to the encroachment and also because the offer had not been made in writing.

*The Jury Verdict*

The jury questions were answered favorably to Lone Star and Willard as follows:

1. The trespass of the Willards, Henderson and First American caused damage to Lone Star's pipeline.

2. Henderson acted with malice in committing the trespass.

3. First American acted with malice in committing the trespass.

4. First American engaged in unfair or deceptive act(s) or practice(s) with respect to Lone Star.

5. First American knowingly engaged in these act(s).

6. Lone Star suffered damages in the amount of $16,000 for the repairs and loss of use of its pipeline from the trespass.

7. $50,000 is assessed against Henderson and awarded to Lone Star as exemplary damages.

scription of its location on the property.

**3.** Under the rules of the State Board of Insurance, now the Texas Department of Insurance, the underwriter, First American, received 20% of the premium or approximately $78 for writing this title insurance coverage.

**4.** In the latter part of 1988, Lone Star had estimated the pipeline moving expense to be $12,000.

8. $25,000 is assessed against First American and awarded to Lone Star as exemplary damages.

9. $50,000 is assessed against First American and awarded to Lone Star as additional damages.

10. $45,000 is assessed as the reasonable attorney's fees to be awarded to Lone Star.

11. First American engaged in unfair or deceptive act(s) or practice(s) with respect to Willard.

12. First American knowingly engaged in unfair or deceptive act(s) or practices(s) with respect to Willard.

13. Willard suffered damages in the amount of $150,000 for mental anguish and the decrease in the market value of his property resulting from the actions of First American.

14. $43,000 is assessed against First American and awarded to Willard as additional damages.

15. First American engaged in false, misleading or deceptive act(s) or practice(s) which were a producing cause of damages to Willard.

16. First American knowingly engaged in the false, misleading or deceptive conduct.

17. $100,000 is assessed against First American and awarded to Willard for the difference in market value of his property as constructed and as represented, consequential damages and his mental anguish.

18. $50,000 is assessed against First American and awarded to Willard as additional damages because of its knowingly engaging in false, misleading or deceptive conduct which was a producing cause of damages to Willard.

19. $5,000 is assessed against First American as Willard's attorney's fees for preparation and trial, $5,000 for an appeal to the Court of Appeals and $500 for responding to an Application for Writ of Error in the Supreme Court and $500 if the Application is granted.

First American and Henderson each filed Motions for Judgment Non Obstante Veredicto and motions for new trial. The trial court overruled the motions except that it disregarded the jury's finding that Henderson acted with malice in aiding and assisting the trespass. Because it considered the damages duplicative, the court required Willard to elect between his recovery under the TEX. INS.CODE ANN. art. 21.21 § 16(b) (Vernon Supp.1991) and the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") cause of action, TEX. BUS. & COM. CODE ANN. § 17.41, et seq. (Vernon 1977) (amended 1979); Willard elected to recover damages under the Insurance Code claim. The court, therefore, disregarded the DTPA damage findings numbered 17 and 18. Additionally, the court rendered judgment that Lone Star's easement was valid.

*The Trial Court Judgment*

The court rendered judgment that Lone Star recover the following:

- $16,000 in actual damages for trespass from Willard, Henderson, First American and South Place;
- $45,000 attorney's fees from First American;
- $25,000 exemplary damages from First American for trespass;
- $50,000 additional damages from First American;
- 10% pre-judgment interest commencing August 8, 1989 from Willard, Henderson, First American and South Place; and
- 10% interest on the Judgment.

The court rendered judgment that Willard recover the following:

- $150,000 actual damages for Insurance Code violations from First American;
- $300,000 (an additional sum of two times the actual damages) from First American for deceptive practices under sec. 16(b)(1) of art. 21.21 of the Insurance Code;
- Attorney's fees from First American;
- 10% pre-judgment interest commencing August 8, 1989 from First American; and

● 10% interest on the Judgment.

*Liability under Art. 21.21 of the Insurance Code*

First American's first thirteen points assert that for a variety of reasons neither Willard nor Lone Star should recover damages for unfair claim settlement practices against the title insurer. These points are couched in evidence sufficiency points, assignment of lack of standing to bring the claims, and, as applicable to Willard, the lack of duty by First American to discover or disclose to Willard the existence of the Lone Star easement/pipeline across his property.

When, as here, the appellant does not have the burden of proof at trial, a legal sufficiency point of error allows the court to examine only the evidence and inferences that tend to support the jury's findings while ignoring all evidence to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex.1992). If there is any probative evidence to support the jury's findings, the "no evidence" challenge must be overruled. *In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951). On a factual insufficiency challenge, having considered all of the evidence for and against the jury's finding, the court of appeals must affirm the judgment based upon the verdict unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Ibid; Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985).

The prevailing parties strongly urge that First American had waived these points of error because the trial court error was invited by First American. Specifically, Lone Star and Willard insist that First American had conceded liability by its own actions and that of its counsel including its earlier letters to Henderson and by its attorney's opening statement to the jury and his closing argument; furthermore, First American offered the testimony of Tommy R. Goode, Henderson's President, and the testimony of an expert witness, Henderson attorney Robert Minton, both of whom concluded that First American had accepted liability for the house's location across Lone Star's easement.

It is undisputed that First American did make liability concessions. In our view of the evidence, the asserted concessions pertain to First American's acknowledgement of liability to its insured, Henderson, because of First American's failure to except from coverage the Lone Star easement encroachment by Willard's house construction. There is no reference in the alleged concessions to unfair claims settlement practices or deceptive trade practices.

A review of the record shows that the two references in First American's counsel's opening statement specifically related to a concession to pay the expenses for moving the pipeline from beneath Willard's house because it had covered that risk in the *policy* written for Henderson. Likewise, the letter from First American to Pearson, dated September 4, 1990, specifically acknowledged that First American will be liable to indemnify *Henderson* for Henderson's damages arising out of the encroachment upon Lone Star's easement. The second letter, from First American to David Brown, Henderson's legal counsel, dated September 24, 1990, acknowledged that First American "has accepted *policy liability* for the referenced matter." (Emphasis ours).

Likewise the excerpts from expert witness Minton's testimony specifically pertained to First American's *policy* liability to *Henderson*. The same applies to Goode's testimony concerning First American's liability to *his company* because of the failure to except the easement in the binder and commitment.

Finally, Appellees urge that First American's counsel conceded liability in his closing argument. In the cited portion of the argument, Appellants' counsel discussed the original disagreement between First American and *Henderson* as to *policy* coverage because of a factual dispute as to liability for Lone Star's easement. First American's counsel concluded by stating that his company had recognized its liability under the policy contract and had now "done everything that they're supposed to do under the *policy*." (Emphasis ours).

Despite showing that the concession evidence related only to First American's policy obligation to indemnify Henderson for the easement encroachment, we have also considered Lone Star's authorities for the proposition that a party may not complain on appeal of action by the trial court that an appellant had invited or induced. *See General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916 (Tex.1993), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); *Tracy v. Annie's Attic, Inc.,* 840 S.W.2d 527 (Tex. App.—Tyler 1992, writ denied); *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372 (Tex.App.—San Antonio 1992, writ denied), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993). In these cases the complaining party had sought specific action by the trial court, the court acquiesced and made the requested ruling, and then on appeal the complaining party assigned that invited conduct as ground for reversal.

■ These cases are inapposite. Here, First American or Henderson did not lure the trial court into any ruling or conduct which First American now asserts to be *re*versible error. First American did not invite the trial court to submit the jury questions on Insurance Code or DTPA violations; these were Appellees' jury issues. If the principle of invited error may be extended to the realm of invited *jury* responses, First American's concessions of liability before the jury related only to the extent of title policy coverage, not to Appellants' other theories of recovery which First American has challenged here. We therefore agree with First American that the concessions did not invite trial court error.

■ As for the alleged claim of Insurance Code violations, sec. 16 of art. 21.21 of the Texas Insurance Code does not confer upon third party claimants a direct cause of action against an insurer for unfair claim settlement practices. *Allstate Insurance Company v. Watson,* 876 S.W.2d 145, 147 (Tex.1994). Lone Star has acknowledged this to be a correct statement of Texas law; its recovery for unfair claim settlement practices is dependent upon the validity of its contention that First American invited error, with which we have disagreed as discussed above. First

American's points of error five, six, eight, nine and twenty one are sustained. It will not be necessary to address First American's point seven.

Willard, however, contends that *Watson* is not controlling as to his recovery of damages. Willard argues that his evidence pertaining to his standing to assert the unfair settlement practices claim against First American is distinguishable from the *Watson* facts, first, because he had paid the premium for the insurance policy and second, because he would directly benefit from the payment by the insurer of the expense of removal of the pipeline from beneath his house.

■ It is undisputed that Willard paid the premium to First American for Henderson's title policy. Customarily, the home builder/borrower pays this expense, because a lending institution requires that the borrower has title to the real property on which its loan proceeds will be expended. Rather than require the borrower to incur the expense of a title examination, a title insurance policy in favor of the lender is an inexpensive means of assuring the validity of its title. We disagree that the borrower's act of paying the premium for the title insurance injects the borrower into the insurance contract as a party to the policy.

■ Furthermore, Willard's contention that he would derive a significant benefit from First American's payment of the expense of moving Lone Star's pipeline from beneath his house does not alter his relationship with the contracting parties. Certainly the insured, Henderson, would benefit from First American's indemnification of the claim against it. As in *Watson,* a benefit to a third party does not thrust that party into a contractual relationship with the two parties to the contract or confer upon Willard a direct cause of action against First American for unfair claim settlement practices.

The borrower, Willard, did not purchase an owner's title policy which would have contractually provided the relief he seeks here. Should we grant such relief, Willard would enjoy the fruits of the contractual relationship he seeks with First American without buying the coverage. Willard argues that

there was testimony from First American that they would not have offered such an owner's title policy to Willard had he requested it. First American honored its prior commitment to Henderson to cover the unexpected Lone Star risk but doubtless would not have offered the same coverage to Willard absent a commitment to do so before the encroachment was discovered.

It is undisputed that First American is the insurer and only Henderson is the insured of the subject policy. We disagree that Willard's posture in this transaction circumvents the supreme court's opinion in *Watson.* For all the reasons stated, Willard's recovery for First American's alleged misconduct in its manner and procedure in settling with them must be disallowed. We sustain First American's third and fourth points of error. Therefore, its first, second, tenth, eleventh, twelfth and thirteenth points of error will not be addressed.

*Liability under the Trespass Theory*

In answer to the first jury question, the jury found that both First American and Henderson had trespassed, causing damage to Lone Star's pipeline. It being undisputed that neither company physically participated in the construction of Willard's house construction over the pipeline, the liability theory asserted against them by Lone Star is predicated upon their conduct in aiding, assisting or advising Willard in his trespass upon Lone Star's easement. *McDaniel Brothers v. Wilson,* 70 S.W.2d 618, 621 (Tex. Civ.App.—Beaumont 1934, writ ref'd).

▆ A title insurer is not a title abstractor, and it owes no duty to examine title either for the insured or for any third party. *Martinka v. Commonwealth Land Title Ins. Co.,* 836 S.W.2d 773, 777 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The title information recited in the binder is procured by the insurer for its own purposes in determining the title to the property and for its use in deciding if there are title risks it should not underwrite; the binder was not prepared or furnished for Willard's use or reliance. *Ibid; Stewart Title Guar. Co. v. Cheatham,* 764 S.W.2d 315, 320 (Tex.App.—Texarkana 1988, writ denied); *Tamburine v. Center Sav. Assn.,* 583 S.W.2d 942, 949 (Tex.Civ.App.—

Tyler 1979, writ ref'd n.r.e.). First American did not publish the binder to Willard nor did any of its agents or employees discuss title information with Willard. There was evidence that the contractor, Peterson, actually obtained the binder from Pearson and delivered it to Henderson's office but that First American had no part in the arrangements that permitted Peterson to see the document.

▆ Lone Star asserts that First American is liable for aiding, assisting or advising the trespasser, because Pearson's president, Young, should have disclosed the existence of the Lone Star easement in the title policy binder. A title insurer may be liable under the DTPA for affirmative representations that are a producing cause of damages to the insured. *Ibid; First Title Co. v. Garrett,* 860 S.W.2d 74, 76 (Tex.1993). As stated, however, the only affirmative representation in the interim construction binder was that the mortgagor had good and indefeasible title to the land covered by the policy. There was no mention of the presence or absence of Lone Star's easement; this silence was not an actionable affirmative representation as to the existence or non-existence of Lone Star's easement. *See Chicago Title Insurance Company v. McDaniel,* 875 S.W.2d 310, 311 (Tex.1994); *Tri–Legends Corp. v. Ticor Title Ins. Co. of California,* 889 S.W.2d 432, 444 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Furthermore, one to whom a representation is not directed is not entitled to rely on that representation. *Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945 (Tex.App.—Houston [1st Dist.] 1994, no writ).

Lone Star also argues that First American, after learning of the pipeline, aided, abetted or advised in the perpetration of the trespass by later honoring its prior agreement to write the title insurance without excepting Lone Star's easement from its coverage. We do not agree that First American at that time could withdraw its commitment to provide this title insurance for Henderson. First American had not excepted the Lone Star easement risk from its coverage in the binder, and therefore Henderson was pro-

tected under First American's policy from Lone Star's claim.

A mortgagee title insurance policy is an indemnity policy imposing upon the insurer, First American, only the duty to indemnify the insured, Henderson, in the event of a loss occasioned by a defect in the title of its collateral. *Chicago Title Insurance Company v. McDaniel,* 875 S.W.2d 310, 311 (Tex. 1994). Thus, First American's liability for trespass under the policy must be predicated upon a loss sustained by Henderson. The evidence discloses that Willard had regularly made his loan payments to the time of trial and no loss had been sustained by Henderson resulting from the reduction in the value of the collateral. As discussed above, First American has conceded that it is contractually responsible for any loss to *Henderson* arising from the construction of the Willard house over the Lone Star easement. We thus focus on Henderson's liability.

We first must determine whether Henderson has sustained a loss that is subject to indemnification by First American. The trial court judgment awarded $16,000 damages to Lone Star against Henderson (and the other parties it found to have trespassed over the easement). Thus, the trial court judgment obligates Henderson to pay Lone Star its actual damages from the encroachment. Furthermore, although Henderson had not at the time of trial sustained an actual loss in the value of its collateral, the evidence is undisputed that the presence of an eight inch high pressure gas pipeline under the Willard house materially depreciates the market value of that property. Therefore, because of the condition of the property at trial as well as in the *judgment* award of the trial court, the value of Henderson's collateral has been reduced by the encroachment. For these reasons, we hold that Henderson has sustained a monetary loss from the trespass upon Lone Star's easement for which Henderson is entitled to indemnification by First American under the terms of the mortgagee title insurance policy.

We furthermore conclude that there is sufficient evidence to support the jury's affirmative finding of trespass liability as it relates to Henderson. The trespass had commenced before Henderson had knowledge of the easement; construction of the trespassing structure was in progress when Henderson first became aware of the existence of the encroachment. Upon being apprised of the pipeline's existence under the house construction, Henderson ceased financing the structure. The project stopped.

Although Henderson did not own either the property or the pipeline and did not have the incidents of ownership to order the removal of either the pipeline or the house-in-progress, it appears that the trespassing condition could have been eliminated at that time. By halting the flow of construction money, house construction had been effectively stopped. Uncompleted and uninhabitable, the house would have been dismantled. Likewise, redirection of the pipeline from beneath the house would have eliminated the trespass.

Henderson was aware that First American had failed to except the Lone Star easement from its title insurance coverage and that the policy provided for indemnification by First American for expenses incurred in terminating the trespass. Instead of exercising an option that would have resulted in eliminating the trespass, Henderson sought and secured an indemnity agreement from Willard, resumed financing the house, completed the trespassing structure and allowed the trespass to continue to the time of trial. With its financing leverage, Henderson could have terminated the trespass. We conclude that there is sufficient evidence to support the jury finding that Henderson's decision not to require the elimination of the encroachment but rather to complete the house and continue the trespass was Henderson's intentional decision that aided and assisted Willard's trespass upon Lone Star's easement. Henderson's points of error one and two are overruled.

We hold that there is no evidence that First American is liable to Lone Star on the trespass theory because it had no relationship with or contact with Willard or Lone Star and because it had no authority to eliminate the trespassing condition. First Ameri-

can's point of error fourteen is sustained; thus, point fifteen need not be addressed. First American, however, has acknowledged that it is contractually obligated to indemnify Henderson for the $16,000 in damages sustained by Lone Star resulting from the trespass.[5]

*Liability for Exemplary Damages*

Our holding that there is no evidence that First American aided, assisted or advised Willard in the commission of the trespass forecloses recovery of exemplary damages by Lone Star against First American for such trespass. First American's sixteenth and eighteenth points of error are sustained; we need not address its seventeenth or nineteenth points.

■ Lone Star's Cross Point asserts that the trial court erred in granting Henderson's motion for judgment non obstante veredicto as to the jury finding that Henderson acted with malice in committing the trespass. The trial court ruled that there was no evidence to support that jury finding. Our standard of review likewise is that in order to sustain the trial court's judgment, we must consider whether there is more than a scintilla of evidence to support the jury's finding. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–228 (Tex.1990). It is undisputed that Henderson was involved in this transaction as Willard's lender for the construction of his home only. As stated, we have held that Henderson's participation as a trespasser is limited to its aiding or assisting in the trespass by not taking action to terminate the trespassing condition. The standard for awarding exemplary damages in a trespass is:

To authorize a finding of exemplary damages for trespass, the evidence must show some element of fraud, malice or oppression. The act which constitutes the cause of action ... must be actuated by and accompanied with some evil intent, or must be the result of gross negligence or such disregard on anyone's rights as is deemed equivalent to such intent.

*Houston Lighting & Power v. Sue,* 644 S.W.2d 835, 839 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ There was no evidence that Henderson was actuated by any evil intent or gross negligence in not requiring the house or the pipeline to be moved. Likewise, no evidence was adduced that Henderson's conduct suggested such disregard of any parties' rights as is deemed equivalent to such evil intent. Henderson's failure to insist upon the elimination of the trespass was simply a passive response to the problem. At no time did Willard seek to eliminate the trespass; on the contrary, Henderson was acceding to Willard's expressed desire that the house be completed and Willard has consistently made his loan payments in full to Henderson although the gas pipeline continues to lie beneath his house. Although a letter from Henderson to First American reflects that Lone Star had made demand upon Willard to eliminate the trespass, there is no evidence that Lone Star had made such demand upon Henderson. In fact, Lone Star has never expressed an objection to Henderson's completion of the financing of the Willard house. Lone Star's Cross Point is overruled.

*Liability for Attorneys' Fees*

In its twentieth point of error, First American asserts that the trial court erred in awarding attorneys' fees to Lone Star.[6] Lone Star contends that its attorneys' fees are recoverable under its exemplary damage count, its art. 21.21 of the Texas Insurance Code claim or as authorized by its Declaratory Judgment action on the validity of its easement. TEX. CIV. PRAC. & REM.CODE ANN. 37.009 (Vernon 1986). As we have held that no recovery should be allowed for either exemplary damages or insurance code violations, Lone Star must establish its claim for attorneys' fees by the Declaratory Judgment count.

■ Lone Star sought declaratory relief commencing with its original petition; the

---

5. The jury finding to Question 6 that Lone Star sustained $16,000 actual damages as a result of the trespass has not been challenged on appeal.

6. In its Corrected Judgment the trial court eliminated Henderson's joint and several liability for Lone Star's attorneys' fees.

recovery of attorneys' fees, however, was not specifically pled in that count but was asserted in the prayer; a claim for attorneys' fees was also alleged in its Insurance Code violation pleading. In the pleadings upon which it went to trial, Lone Star sued for declaratory judgment relief and included general allegations seeking reasonable and necessary attorneys' fees in its prayer. Pleadings under the Declaratory Judgment Act are to be liberally construed. *Frost v. Sun Oil Co.,* 560 S.W.2d 467, 473 (Tex.App.—Houston [1st Dist.] 1977, no writ). There is no particular type of pleading required by the Act. *James v. Hitchcock Indep. School Dist.,* 742 S.W.2d 701, 704 (Tex.App.—Houston [1st Dist.] 1987, writ denied). We conclude that Lone Star's pleadings raised the claim for attorneys' fees under the Declaratory Judgment Act.

The jury and the judgment awarded Lone Star $45,000 as a reasonable fee for its necessary legal services in this case. There was no testimony allocating the fee among the counts, nor was there a division of the fee by the jury among the various theories of recovery in Lone Star's suit. No objection was made to the failure to segregate, and therefore the failure to segregate must be considered to be waived. *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex. 1988); *Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 823 (Tex.1985); *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985); TEX.R. CIV. P. 274.

■■■ The statute authorizes the granting of attorneys' fees in declaratory judgment actions upon the discretion of the trial court. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1986); *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985). On appellate review, that portion of the trial court judgment concerning the granting or denial of attorneys' fees will not be reversed absent a clear showing of an abuse of discretion. *Ibid.* The abuse of discretion test is whether the trial court's ruling that attorneys' fees were recoverable was arbitrary or unreasonable. *Landry v. Travelers Insurance Company,* 458 S.W.2d 649, 651 (Tex.1970). Here, the validity of Lone Star's easement, the

subject of the declaratory judgment action, was the condition upon which all of Lone Star's claims were predicated. Under the circumstances, we cannot conclude that the trial court clearly abused its discretion by awarding the attorneys' fees as found by the jury. First American's twentieth point of error is overruled.

■■■ Additionally, the jury found and the trial court ordered that Willard should recover his attorney's fees from First American. An award of attorney's fees to a party is dependent upon that party recovering actual damages. *Flowers v. Flowers,* 589 S.W.2d 746, 748 (Tex.App.–Dallas 1979, no writ); *Cen–Tex Portable Bldgs., Inc. v. Young,* 598 S.W.2d 42, 44 (Tex.App.El Paso 1980, no writ). Upon reversal of a claimant's judgment, all dependent causes of action are simultaneously defeated. *Id.; Starnes v. Holloway,* 779 S.W.2d 86, 95 (Tex.App.— Dallas 1989, writ denied). We have reversed Willard's recovery of actual damages from First American. Willard's attorney's fee award from First American is simultaneously reversed. *Id.* Here, First American has not challenged Willard's recovery of attorney's fees. The assertion of a point of error is not a requisite where there has been an automatic reversal of a dependent cause of action as in the instant case. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 613–14 (Tex.1996); *Houston Mercantile v. Dailey Petroleum,* 930 S.W.2d 242, 249 (Tex. App.—Houston [14th Dist.] 1996, no writ history). Willard's recovery of attorney's fees from First American cannot be allowed.

*Commencement of Prejudgment Interest*

First American's twenty-second point of error asserts that the trial court erroneously ordered prejudgment interest on both prevailing parties' damages to commence on the date the suit was filed rather than the date suit was filed against First American. As we hold that neither Willard nor Lone Star may recover actual damages from First American, the issue as to the commencement of prejudgment interest is moot. Therefore, First American's twenty-second point of error is sustained. Lone Star's cross point seeking such prejudgment interest against First

American is overruled. The trial court's ruling that Lone Star recover prejudgment interest against Willard, Henderson and South Place for trespass is unassailed.

*Liability for DTPA Claims*

 The DTPA jury findings were favorable to Willard's recovery from First American. Because the trial court ruled that the jury damage findings pertaining to the Insurance Code violations were duplicative of the DTPA damage findings, it directed Willard to elect between these two theories of recovery. Willard chose the Insurance Code damage findings, and the judgment reflected that decision, specifically disregarding the jury findings to DTPA questions 17 and 18. The question presented is whether the DTPA damages are recoverable and may be substituted for the disallowed award under art. 21.21 of the Insurance Code. Other than the summary of each jury finding, there is no allusion to the DTPA claim in the judgment of the trial court. Although Willard in his appellate brief makes an abbreviated argument supportive of the jury's DTPA findings, he has not asserted a cross point seeking recovery under the abandoned DTPA theory nor sought the specific relief of reasserting the DTPA damage findings. He, however, is not required to urge this alternative ground of recovery until the appellate court has reversed the Insurance Code claim. *Boyce Iron Works v. Southwestern Bell Telephone,* 747 S.W.2d 785, 787 (Tex.1988); *Oak Park Townhouses v. Brazosport Bank,* 851 S.W.2d 189, 190 (Tex.1993). Inasmuch as the recovery under the Insurance Code has herein been reversed, to expeditiously determine the entire case, we will address Willard's DTPA claim.

The jury's affirmative answer to its Question 15 is the only predicate for the various DTPA findings. In Question 15 the jury found that First American had engaged in a "false, misleading, or deceptive act or practice" that was a producing cause of damages to Willard. In connection with this question, the court instructed the jury that the phrase "false, misleading, or deceptive act or practice" means that the company represented "that an agreement confers or involves rights that it did not have or involve." That jury instruction quoted subsection (12) of § 17.46(b) of the DTPA establishing that subsection (12) is the basis for the DTPA claims.

 To be actionable under subsection (12), the misrepresentations must have been uttered with reference to the terms of the underlying contract between the parties. *Home Sav. Ass'n. Service v. Martinez,* 788 S.W.2d 52, 57 (Tex.App.—San Antonio 1990, writ denied). Here, the pertinent instrument was the interim construction binder. The only parties to the binder were the insurer, First American, and the insured, Henderson. There is no evidence of a contract between Willard and First American. It is undisputed that the parties to the insurance contract were First American and Henderson and that Henderson was the only title policy insured.

Likewise, there is no evidence of a statement by First American that might be construed as misrepresenting Willard's "rights, remedies, or obligations under the contract itself." The only statement or omission in the binder about which there has been any complaint was the absence of a coverage exception for the Lone Star easement from policy coverage. As stated, the absence of this exception in the binder was not an affirmative misrepresentation as to the easement. *Martinka,* 836 S.W.2d at 777. Furthermore, there is no evidence that the binder was prepared or furnished for Willard's reliance or use or that First American had a duty to disclose the existence of an easement even to Henderson and clearly not to Willard, a non-party party to the contract.

 We hold that for all the reasons stated there is no evidence to support the jury's answer to Question 15 that First American committed a false, misleading, or deceptive act or practice which was a producing cause of damage to Willard. First American's twenty-third point of error is sustained; therefore, it will not be necessary to address points twenty-four, twenty-five, twenty-six or twenty-seven.

The trial court's judgment that Lone Star recover $16,000 from Henderson, Willard and South Place is affirmed but reversed and

rendered as to First American. The trial court judgment that Lone Star recover $45,000 in attorneys' fees from First American is affirmed. The trial court judgment that Lone Star recover 10% pre-judgment interest commencing August 8, 1989 from Willard, Henderson, and South Place is affirmed but it is reversed and rendered as to First American. The trial court judgment that Lone Star recover $25,000 exemplary damages and $50,000 additional damages from First American is reversed and rendered that it take nothing as to these damages.

The trial court judgment that Willard recover his attorney's fees from First American is reversed and rendered. The trial court judgment that Willard recover pre-judgment interest from First American is reversed and rendered as is the award of 10% interest on the judgment. The trial court judgment that Willard recover $150,000 actual damages and $300,000 for deceptive practices under the Insurance Code is reversed and rendered that he recover nothing as to these damages.

In all other respects the judgment of the trial court is affirmed.